UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEONARD MALEWICZ, *et al.* ) | |
| ) | |
| Plaintiffs ) | |
| ) | |
| v. ) | No. 04-00024 (RMC) |
| ) | |
| CITY OF AMSTERDAM ) | |
| ) | |
| Defendant ) | |

**SUPPLEMENTAL STATEMENT OF INTEREST OF THE UNITED STATES**

The United States previously filed a Statement of Interest ("SOI") in this case to inform the Court of the background and purpose of 22 U.S.C. § 2459 ("Section 2459") and to present its concerns as to the potential effects of plaintiffs' lawsuit upon the interests that section 2459 is designed to foster. Expressly authorized by statute, *see* 28 U.S.C. § 517, the SOI is consistent with the Supreme Court's recent invitation to the Executive Branch "to express its opinion on the implications of exercising jurisdiction over *particular* petitioners in connection with *their* alleged conduct." *Republic of Austria v. Altmann*, 124 S. Ct. 2240, 2255 (2004) (emphasis in original).

In their Response to the SOI ("Pls' Resp."), plaintiffs have argued that the Government's concerns are unwarranted and irrelevant, and that its views are not entitled to deference.[1] The United States files this Supplemental Statement of Interest to explain

---

[1] Plaintiffs incorrectly impute to the Government the position that section 2459 relates only to "seizure" of artwork based on a reference to the short title of the Act in the SOI. *See* Pls' Resp. at 10 note 9. The SOI, however, elsewhere refers to section 2459 as prohibiting "seizure and other forms of judicial process . . . ." in accordance with the plain text of section 2459. *See, e.g.*, SOI at 3 note 2 and accompanying text.

further its concerns that a finding of jurisdiction based solely on lending immunized artwork for a cultural exhibition will undermine the purposes of section 2459.

1. Permitting Jurisdiction Based Solely Upon an Immunized Exhibition Threatens the Cultural Benefits Provided by Section 2459

Section 2459 is an important tool for encouraging the exhibition of foreign artwork in this country. *See* SOI at 4-6; Pls' Resp. at 2. Section 2459's legislative history establishes that it was meant to provide assurances to foreign lenders so the American public would have the opportunity to see cultural and artistic exhibits that otherwise would not be available. H. Rep. No. 1070, 89th Cong., 1st Sess. 2-3, *reprinted in* 1965 U.S.C.C.A.N 3577-78. Implementation of the section 2459 program thus advances important U.S. national interests, including public diplomacy initiatives of the U.S. government, outreach efforts of the American museum community, and avoidance of friction with foreign lenders, including foreign states and their political subdivisions.

The Executive Branch has been responsible for administering section 2459 for forty years, which has brought it into regular contact with the American museum community and foreign lenders and has provided it with particular insight into the likely effects of changing the principles governing immunized exhibitions.[2] As explained in the SOI at 6-7, it is the considered view of the Executive branch that if jurisdiction over a sovereign lender could be established solely by virtue of introduction into the United States of an exhibit immunized under section 2459, foreign states would be far less likely

---

[2] The Department of State administered section 2459 until 1978, when these responsibilities were redelegated to the International Communication Agency, which was subsequently redesignated as the United States Information Agency ("USIA"). In 1999, the Department of State resumed responsibility for administering section 2459 when it was consolidated with USIA pursuant to the Foreign Affairs Reform and Restructuring Act of 1998. *See* 22 U.S.C. 6501 *et seq.*

2

to agree to share their artwork with the American public, undermining the principal objective of section 2459. This view should be accorded deference by the Court "as the considered judgment of the Executive on a particular question of foreign policy." *See Altmann*, 124 S. Ct. at 2255; *see also Sosa v. Alvarez-Machain*, 124 S. Ct. 2739, 2766 n.21 (2004).[3]

The plaintiffs have cited the continued willingness of foreign lenders to authorize exhibits during 2004 as a reason not to defer to the Executive's views in this matter. Pls' Resp. at 6-8, Ex. C. But plaintiffs' chart (attached as Exhibit C to their response) does not account for the fact that agreements to lend artwork are frequently signed well prior to the publication of Federal Register notices for the exhibits. For example, according to information provided by the National Gallery, the Rijksmuseum and Museum Boijman's agreements to lend works for the most recently approved exhibit on plaintiffs' chart ("Rembrandt's Late Religious Portraits"), *see* Pls' Resp. at 7-8, were both signed prior to the filing of this suit.

In addition, the practice cited is not evidence of how lenders would behave if introducing an immunized exhibit were treated as a submission to U.S. jurisdiction. No court has adopted that view, and to the knowledge of the United States no party has sought to assert jurisdiction on such a basis. As such, this is a case of first impression.[4]

---

[3]   By this SOI, the Executive is not asserting authority to eliminate rights of claimants, *see* Pls' Resp. at 12-13; rather, it is addressing the likelihood that foreign artwork will not be loaned for exhibition in the United States, and thus would not be present for claimants to pursue in any event.

[4]   The plaintiffs and the City of Amsterdam in their responses to the SOI have referred to the issue of whether the Department of State or the City of Amsterdam were made aware of the plaintiffs' intention to file suit. Pls' Resp. at 3-5; City of Amsterdam's Reply to Plaintiffs' Response to the Statement of Interest of the United States at 5.

3

It would not be expected that the filing of this lawsuit alone, prior to any ruling on defendant's motion to dismiss, would significantly affect foreign lending practices.

To the extent there is relevant practice, it would be the growing concerns over litigation risk that have led to an increased demand for State Department immunity determinations. Section 2459 was originally enacted after the Soviet government refused to lend artwork for exhibition in the United States without protection from litigation. SOI at 6. In recent years, the U.S. government has seen a rise in the number of immunity applications. *Id*. at 4. American museums have increasingly availed themselves of the federal protection afforded by section 2459 – sometimes on their own, and sometimes at the insistence of foreign lenders. *Id*. at 4-5. The United States is concerned that the willingness of lenders to make their art available would be dramatically altered if lenders believed they were submitting to U.S. jurisdiction by sharing their artwork with the American public under the section 2459 program.

> 2. Following Enactment of Section 2459, Foreign Governments Would Not Have Expected the Importation of Artwork Into the United States Under a Grant of Immunity To Be the Basis for Jurisdiction in a Lawsuit Against a Foreign Sovereign Lender

In disputing the United States' SOI, plaintiffs also argue that foreign states should already expect that importation of their immunized artwork is a recognized basis for permitting lawsuits over the artwork. Pls' Resp. at 9-11. The plaintiffs maintain that even after enactment of section 2459, suits could be brought against foreign sovereigns

---

Without taking a position on the relevance, if any, of this issue to the questions before the Court, the United States would note that plaintiffs did not inform the Department of State or (so far as the United States is aware) the City of Amsterdam that they intended to bring suit in *this country*.

4

for recovery of property that was not in the possession of the sovereign, and that *in rem* actions did not require attachment of property. *Id.*

This analysis overlooks the fact that when section 2459 was enacted, it was necessary to attach or seize the sovereign's property to give the sovereign notice of a suit and to obtain jurisdiction over the sovereign. As stated in Dellapenna, *Suing Foreign Governments and Their Corporations* (2d ed. 2003) (excerpted in Appendix B to plaintiffs' response), prior to the Foreign Sovereign Immunities Act ("FSIA"), courts "hesitated to assert personal jurisdiction over a foreign state." *Id.* at § 4.7. As a consequence, "[a]part from instances of jurisdiction by consent of the foreign state, *jurisdiction was based routinely on attachment of assets of the foreign state located within the territorial reach of the court.*" Dellapenna at § 4.7 (emphasis added). It was the attachment of the sovereign's property that was deemed to provide it with adequate notice to establish personal jurisdiction, as other methods of service did not generally exist.

The House of Representatives Committee Report for the FSIA confirms this. It explains that one of the purposes of the FSIA was to "provide a statutory procedure for making service upon, and obtaining *in personam* jurisdiction over, a foreign state," thereby *"render[ing] unnecessary the practice of seizing and attaching the property of a foreign government for the purpose of obtaining jurisdiction."* H.R. Rep. 94-1487, 94th Cong., 2d Sess. at 8, 1976 U.S.C.C.A.N. at 6606 (emphasis added). The Report further

states that the FSIA's service provisions were "intended to fill a void in existing Federal and State law . . . ." *Id.* at 23, 1976 U.S.C.C.A.N. at 6622.[5]

The FSIA codified for the first time not only methods of service on foreign sovereigns, but also the circumstances in which personal and subject matter jurisdiction would be permitted and immunity denied. H.R. Rep. 94-1487 at 7-8, 12-13, 1976 U.S.C.C.A.N. at 6605-06, 6610-12. In the case of claims against foreign states for property allegedly taken in violation of international law, section 1605(a)(3) requires that the property at issue must be "present in the United States in connection with a commercial activity carried on in the United States by the foreign state." This nexus with the United States was meant to embody "[t]he requirements of minimum jurisdictional contacts and adequate notice . . . . *Cf. International Shoe Co. v. Washington*, 326 U.S. 310 (1945), and *McGee v. International Life Insurance Co.*, 355 U.S. 220, 223 (1957)." H.R. Rep. No. 94-1487 at 13, 1976 U.S.C.C.A.N. at 6612. As stated in *International Shoe*, 326 U.S. at 320, the activities at issue must have "sufficient contacts or ties with the state of the forum to make it reasonable and just according to our traditional conception of fair play and substantial justice" for a court to assert jurisdiction.

---

[5] Plaintiffs argue that as a general proposition an *in rem* action does not require that the property be seized or attached, so long as the lawsuit is commenced when the property is in the jurisdiction and not in the foreign sovereign's possession. Pls' Resp. at 11 note 11. Even assuming that plaintiffs are correct with respect to actions where the defendant is a private party, as explained above, the standard practice for obtaining jurisdiction over and serving a *sovereign* prior to the FSIA was to seize or attach the property. For example, in *Republic of Mexico v. Hoffman*, 324 U.S. 30 (1945), cited in Pls' Resp. at 11 note 12, the foreign sovereign was held not to be immune from suit, but to obtain jurisdiction the plaintiff seized the ship. *Id.* at 35, 36, 38 (stating that it was for the courts to decide the status of the vessel "when seized by judicial process" and describing another case as rejecting immunity because the government was not in possession of the ship "at the time of her arrest"). *See also, e.g., Ex Parte Republic of Peru, the Ucayali*, 318 U.S. 578, 587 (1943) ("Here the district court acquired jurisdiction *in rem* by the seizure and control of the vessel . . . .").

6

Thus, it is appropriate to consider the expectations of foreign sovereigns and the purpose of section 2459 in construing section 1605. The purpose of section 2459 was to reassure sovereigns – to shape their expectations concerning suits and seizures of artwork in the United States. With section 2459 continuing in force, the FSIA should be applied taking this fully into account.

Giving consideration to such expectations is fully consistent with the Supreme Court's decision in *Altmann*. In *Altmann*, the Court found that Congress intended the FSIA's substantive principles of sovereign immunity to apply retroactively to conduct occurring before the FSIA's enactment even if doing so was not anticipated by foreign states at the time. *Altmann*, 124 S. Ct. at 2252-54. By contrast, here the issue is not what the expectations of foreign sovereigns might have been regarding immunity at the time of an alleged taking of property; rather, it is whether subsequent activity by the sovereign that does not form the basis for the complaint – in this case, the lending of art that has been immunized – has a sufficient nexus to the United States to establish personal jurisdiction. The FSIA's legislative history indicates that Congress intended traditional concepts of minimum contacts and fair notice to govern this issue in administering the statute. *See supra* at 6. A finding of no jurisdiction in this case would merely prevent claimants from transforming into a sword what was intended to be only a shield.

7

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in the United States' initial SOI, the United States respectfully requests that the Court give due consideration to the interests of the United States in evaluating defendant's Motion to Dismiss.

Dated: March 17, 2005

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JOSEPH H. HUNT
Branch Director

Of Counsel:

Jonathan B. Schwartz
Deputy Legal Adviser
Office of the Legal Adviser
United States Department of State

VINCENT M. GARVEY
Deputy Branch Director

SAMUEL C. KAPLAN
U.S. Department of Justice, Civil Division
Federal Programs Branch
Mail: P.O. Box 883
      Washington, DC 20044
Street: 20 Massachusetts Ave., NW, Room 7302
      Washington, DC 20001
Phone: (202) 514-4686
Fax: (202) 616-8202
Email: samuel.kaplan@usdoj.gov

8

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEONARD MALEWICZ, *et al.* )<br>)<br>Plaintiffs )<br>)<br>v. )<br>)<br>CITY OF AMSTERDAM )<br>)<br>Defendant ) | No. 04-00024 (RMC) |

### CERTIFICATE OF SERVICE

I hereby certify that, on March 17, 2005, the foregoing Supplemental Statement of Interest of the United States was served by first-class mail on the following persons:

Lawrence M. Kaye, Esq.
Howard N. Spiegler, Esq.
HERRICK, FEINSTEIN LLP
2 Park Avenue
New York, New York 10016
Tel.: (212) 592-1400
Fax: (212) 592-1500
Attorneys for Plaintiffs

Christopher M. Curran, Esq.
Nicole E. Erb, Esq.
WHITE & CASE LLP
601 13th St. NW
Washington D.C. 20005
Tel.: (202) 626-3600
Fax: (202) 639-9355
Attorneys for Defendant

Thomas R. Kline, Esq.
L. Eden Burgess, Esq.
Jennifer L. Spina, Esq.
ANDREWS KURTH LLP
1701 Pennsylvania Ave., N.W.
Suite 300
Washington, D.C. 20006
Tel.: (202) 662-2700
Fax: (202) 662-2739
Attorneys for Plaintiffs

_____
Samuel C. Kaplan