# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LEONARD MALEWICZ, *et al.*,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 04-24 (RMC)** |
| ) | |
| **CITY OF AMSTERDAM,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION

Plaintiffs are surviving heirs of Kazimir Malewicz, a Russian artist who was a pioneer in geometric abstractionism during the first half of the 20th Century. Due to the political situation in the Soviet Union during the latter years of his life, Malewicz entrusted a large number of his paintings to friends in Germany, where he had gone to show them, for safe keeping. In 1956, after Malewicz's death and the end of the Second World War, the City of Amsterdam's Stedelijk Museum ("the City" or "the Stedelijk") acquired some of those paintings from one of the persons to whom Malewicz had entrusted them. In 2003, the City loaned the paintings to the Guggenheim Museum in New York and the Menil Collection in Houston, Texas ("the American Museums"). While the paintings were being exhibited in the United States, Plaintiffs filed this suit against the City alleging that the Stedelijk's acquisition of the paintings in 1956 was unlawful. In March 2005, this Court denied the City's motion to dismiss for lack of jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq.* ("FSIA"), because there was insufficient information in the record to determine whether the FSIA's expropriation exception applied. The City has now submitted additional evidence to support its position that it is immune from suit under the FSIA and renewed its motion to dismiss. For the following reasons, the Court will deny the City's renewed motion.

## I.  FACTUAL BACKGROUND

The Court assumes general familiarity with the factual history of the present dispute from its previous decision.  *See Malewicz v. City of Amsterdam*, 362 F. Supp. 2d 298, 301-04 (D.D.C. 2005).  For purposes of the present motion, the following facts are critical.  The Stedelijk Museum was established and is operated by the City of Amsterdam, which is itself a political subdivision of the Kingdom of the Netherlands.  *See id.* at 306.  In 1956, representatives of the Stedelijk persuaded Hugo Haring, one of the persons to whom Malewicz had entrusted his artwork, to loan the Malewicz paintings in his possession to the museum.  *Id.* at 302-03.  In 1958, the City exercised an option in the loan agreement and purchased the Malewicz artwork for DM120,000.  *Id.* In 2003 the Stedelijk loaned 14 artworks from its Malewicz Collection to the American Museums as part of a temporary art exhibition.  *Id.* at 303.  Two days before the end of the temporary exhibition, Plaintiffs filed this lawsuit against the City seeking damages and injunctive relief.  *Id.*

In its March 2005 opinion on the City's motion to dismiss, the Court reserved ruling on whether the FSIA's so-called "expropriation" exception — which allows a foreign state to be sued if it took rights in property in violation of international law and the property is present in the United States in connection with commercial activity carried out in the United States by the foreign state — applies in this case.  *See id.* at 315.  In that opinion, the Court found that three of the four elements necessary to establish the expropriation exception were present in the record but stopped short of finding that the fourth element was satisfied because there was insufficient evidence to determine whether the City's contact with the United States was "substantial."  *See id.*

The City now renews its motion to dismiss and submits documents that allegedly show that its contact with the United States in connection with the loan of the Malewicz artwork was

insufficient to provide a basis for jurisdiction under the FSIA.  The City also asks the Court to reconsider one of its holdings in the March 2005 decision — namely, that Plaintiffs would not be required to exhaust their remedies in the Netherlands before bringing suit under the FSIA if their claims in that country were time barred.  In addition, the City asks the Court to dismiss the complaint based on the statute of limitations, the "act of state" doctrine, and *forum non conveniens*.

## II. LEGAL STANDARDS

### A.    Rule 12(b)(1)

The City moves for dismissal under Federal Rule of Civil Procedure 12(b)(1) for lack of jurisdiction.  "FSIA establishes a specific framework for determining whether a sovereign is immune from suit and consequently whether the district court has jurisdiction." *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000).  "Generally, in entertaining a motion to dismiss, the district court must accept the allegations of the complaint as true, and construe all inferences in the plaintiff's favor.  However, '[w]here the motion to dismiss is based on a claim of foreign sovereign immunity, which provides protection from suit and not merely a defense to liability, . . . the court must engage in sufficient pretrial factual and legal determinations to satisfy itself of its authority to hear the case before trial.'" *Burnett v. Al Baraka Inv. & Dev. Corp.*, 292 F. Supp. 2d 9, 14 (D.D.C. 2003) (internal citations omitted).  Accordingly, the court must look beyond the parties' pleadings to resolve any factual disputes that are essential to its decision to retain jurisdiction or dismiss the action. *See id.* (citing *Phoenix Consulting*, 216 F.3d at 40); *see also Price v. Socialist People's Libyan Arab Jamahiriya*, 274 F. Supp. 2d 20, 24 (D.D.C. 2003).

"'In accordance with the restrictive view of sovereign immunity reflected in the FSIA,' the defendant bears the burden of proving that the plaintiff's allegations do not bring its case

within a statutory exception to immunity." *Phoenix Consulting*, 216 F.3d at 40 (quoting *Transamerican S.S. Corp. v. Somali Democratic Republic*, 767 F.2d 998, 1002 (D.C. Cir. 1985)). The foreign state must produce evidence establishing that the plaintiff's claim relates to a public act of the foreign state — that is, that the FSIA's exceptions do not apply. *Gould, Inc. v. Pechiney Ugine Kuhlmann*, 853 F.2d 445, 451 n.5 (6th Cir. 1988). "Once the foreign state has produced such prima facie evidence of immunity, the burden of going forward would shift to the plaintiff to produce evidence establishing that the foreign state is not entitled to immunity." *Id.* (quoting H.R. Rep. No. 1487, 94th Cong., 2d Sess. 1, 17, *reprinted in* 1976 U.S.C.C.A.N. 6604, 6616).

### B.      Rule 12(b)(6)

The City also moves for dismissal under Rule 12(b)(6).  A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face, testing whether a plaintiff has properly stated a claim.  Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment]to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (internal citations omitted).  The court must treat the complaint's factual allegations — including mixed questions of law and fact — as true, drawing all reasonable inferences in the plaintiff's favor, *Macharia v. United States*, 334 F.3d 61, 64, 67 (D.C. Cir. 2003); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003), and the facts alleged "must be enough to raise a right to relief above the speculative level," *Twombly*, 127 S. Ct. at 1965.  But the court need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  In deciding a 12(b)(6) motion, the Court

may consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (citation omitted). However, the Court may, in its discretion, consider matters outside the pleadings and thereby convert a Rule 12(b)(6) motion into a motion for summary judgment under Rule 56. *See* Fed. R. Civ. P. 12(b); *Yates v. District of Columbia*, 324 F.3d 724, 725 (D.C. Cir. 2003).

### C.  Rule 54(b)

Finally, the City asks the Court to reconsider its earlier ruling that Plaintiffs were not required to exhaust their remedies in the Netherlands because their claims would be time barred. The City argues that the Court has inherent authority to reconsider its prior ruling under *Langevine v. District of Columbia*, 106 F.3d 1018, 1023 (D.C. Cir. 1997) ("Interlocutory orders are not subject to the law of the case doctrine and may always be reconsidered prior to final judgment"). The City does not cite to or rely on Rule 54(b), which allows district courts to revise their own interlocutory decisions "at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." Under Rule 54(b), relief from interlocutory orders is available "as justice requires." *Childers v. Slater*, 197 F.R.D. 185, 190 (D.D.C. 2000). Moreover, while the law of the case doctrine does not necessarily apply to interlocutory orders, district courts generally consider the doctrine's underlying rationale when deciding whether to reconsider an earlier decision. *See* 18B Wright & Miller, *Federal Practice & Procedure* § 4478.1 (2006).

## III. ANALYSIS

### A.  Jurisdiction Under The FSIA — The Expropriation Exception.

The FSIA provides the "sole basis for obtaining jurisdiction over a foreign state in

[American] courts." *Republic of Austria v. Altmann*, 541 U.S. 677, 699 (2004) (citation omitted); *see also Millen Indus., Inc. v. Coordination Council*, 855 F.2d 879, 883-84 (D.C. Cir. 1988) ("FSIA is the exclusive means of exercising jurisdiction over the foreign sovereigns . . . ."). As a political subdivision of the Kingdom of the Netherlands, the City is "immune from the jurisdiction of the courts of the United States," 28 U.S.C. § 1604, unless one of the FSIA's statutory exceptions applies. The FSIA's "exceptions are central to the Act's functioning: 'At the threshold of every action in a district court against a foreign state, . . . the court must satisfy itself that one of the exceptions applies,' as 'subject-matter jurisdiction in any such action depends' on that application." *Altmann*, 541 U.S. at 691 (quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493-94 (1983)).

Here, Plaintiffs argue that the Court has jurisdiction over this suit against the City under the expropriation exception. *See* 28 U.S.C. § 1605(a)(3). Four elements must be present in order for the FSIA's expropriation exception to apply: (1) "rights in property" are at issue; (2) the property was "taken in violation of international law"; (3) the "property is present in the United States"; and (4) the property is present in the United States "in connection with a commercial activity carried on in the United States by the foreign state." *Id.*

1.    *Commercial Activity in the United States — Substantial Contact.*

As mentioned above, it is the fourth element of the expropriation exception that is at issue in the instant motion. With respect to that element, the phrase "commercial activity carried on in the United States by a foreign state" means "commercial activity carried on by such state and having substantial contact with the United States." *See* 28 U.S.C. § 1603(e). The legislative history of the FSIA provides some examples of what is meant by "substantial contact":

> commercial transactions performed in whole or in part in the United
> States, import-export transactions involving sales to, or purchases

> from, concerns in the United States, business torts occurring in the
> United States . . . and an indebtedness incurred by a foreign state
> which negotiates or executes a loan agreement in the United States, or
> which receives financing from a private or public lending institution
> located in the United States . . . .  This definition, however, is intended
> to reflect a degree of contact beyond that occasioned simply by U.S.
> citizenship or U.S. residence of the plaintiff.

H.R. Rep. No. 1487, 94th Cong., 2d Sess., *reprinted in* 1976 U.S.C.C.A.N. 6604, 6615-16.  Based

on this legislative history, the D.C. Circuit has held that "a contractual arrangement, one part of

which is to be performed in the United States, constitutes a substantial contact with the United

States." *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, 1513 (D.C. Cir. 1988).  Although the

D.C. Circuit looks to the traditional due-process minimum contacts analysis for guidance, the

"substantial contact requirement is stricter than that suggested by a minium contacts due process

inquiry, and . . . isolated or transitory contacts with the United States do not suffice." *Id.*

  In its March 2005 decision, the Court declined to decide whether the City had carried

on commercial activity in the United States in connection with the loan of the artwork because the

record was insufficient to determine whether the City's contact with the United States was

"substantial."  The Court listed a series of questions that would inform its analysis of this issue:

> Apart from the presence of the artworks themselves, what were the
> terms of the loan agreements?   Did the Stedelijk send any
> representatives to this country to work out arrangements, to travel
> with the art, or to oversee its safety and display?  What consideration
> did the Guggenheim or Menil Collection offer for the loan — money,
> a future loan of American art to The Netherlands, a share in any
> receipts from visitors, catalogue sales, and the like — or was this only
> a courtesy between professionals in the art world, as the City argues?

*Malewicz*, 362 F. Supp. 2d at 315.

  In support of its renewed motion, the City submits the Second Supplemental

Declaration of Geurt Imanse, who is the Stedelijk Museum's Chief Curator for Painting and

Sculpture.  The Second Supplemental Imanse Declaration is geared towards answering the foregoing questions, and the City argues that Mr. Imanse's testimony and its supporting documentation establish that the City's contact with the United States was not substantial and, as a result, that the expropriation exception does not apply.

a.     <u>Terms of the Loan Agreement</u>.

According to Mr. Imanse, the American Museums solicited the loan of the paintings from the City in June 2002.  2nd Suppl. Imanse Decl. ¶ 4 and Ex. B.  There were no face-to-face negotiations; all discussions about the terms and conditions of the loan were by telephone and written correspondence.  *Id.* ¶ 19.  By letter dated August 13, 2002, the Stedelijk agreed to loan the Malewicz paintings to the American Museums and to the Deutsche Guggenheim Berlin.  *Id.* ¶ 4 and Ex. B.  The letter outlined the terms and conditions under which the Stedelijk would loan the paintings.  *Id.* Ex. B.  This letter, together with three "loan-agreement forms," comprised the entire loan agreement between the Stedelijk and the American Museums.  *Id.* ¶ 2.  The letter and all three forms were signed in the Netherlands by W.S. van Heusden on behalf of the Stedelijk.  *Id.*  The forms were signed by Elissa Myerowitz on behalf of the Guggenheim Foundation on October 2, 2002, although the record does not indicate where she executed those documents.  *Id.* ¶ 3.

Initially, the Stedelijk insisted on procuring its own insurance for the paintings to be paid by the American Museums.  *Id.* ¶¶ 6-8 and Ex. C.  Ultimately, however, the American Museums provided insurance through a combination of federal indemnity coverage and private fine-arts insurance.  *Id.*  Thus, the American Museums paid the entire cost of insurance.  *Id.*  The Stedelijk also required the American Museums to obtain immunity from seizure for the paintings while they were in the United States.  *Id.* ¶ 12.  Pursuant to that request, the Guggenheim Foundation obtained

a grant of immunity from the U.S. Department of State.  *Id.* Ex. H; *see also Malewicz*, 362 F. Supp. 2d at 303.

Under the terms of the loan agreement, the Stedelijk transferred possession of the paintings to the American Museums in Amsterdam.  *Id.* ¶ 3 and Ex. A.  From Amsterdam, the paintings were sent to the Deutsche Guggenheim in Berlin before being sent to the United States. *Id.* ¶ 4.  Once the American Museums had completed their exhibits, they shipped the paintings to Amsterdam at which point the Stedelijk took them back into its possession.  *Id.* ¶ 3.

The City argues that no substantial contact with the United States can be found based on the negotiation and execution of the loan agreement because the City did not solicit the loan and no Stedelijk representative traveled to the United States during this process.  Mem. of P. & A. in Support of City's Renewed Mot. to Dismiss the Amend. Compl. in its Entirety ("City's Mem.") at 11-12; *see Lempert v. Republic of Kazakstan*, 223 F. Supp. 2d 200, 203 (D.D.C. 2002) (finding no "substantial contact" with the United States when "there were no meetings between the parties in the United States, no significant availment of resources in this country to persuade [the plaintiff] to enter into the contract, and no regular recruitment efforts [in the United States] to obtain an American-based consultant for the legal reform project report.").  The City further argues that because the American Museums were solely responsible for paying the costs of insuring and shipping the Malewicz paintings from Europe to the United States and for obtaining immunity from seizure for the paintings, the American Museums shouldered most of the responsibility for the paintings.  City's Mem. at 13.  And because the American Museums' conduct cannot be imputed to the City, *see Mar. Int'l Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094, 1106 (D.C. Cir. 1982) ("*MINE*") (rejecting argument that "a foreign state 'carries on' activities performed by

another entity simply because the state and that entity . . . can both be seen as participating in the same larger commercial endeavor"), the terms and conditions of the loan agreement do not establish substantial contact.  City's Mem. at 13-14.

          b.     <u>Did the City send representatives to the United States in connection with the loan?</u>

As an additional term of the loan agreement, the City insisted that expert artwork handlers escort the paintings while they were in transit and when they were unpacked for display in the American Museums in order to ensure their safety and proper handling.  2nd Suppl. Imanse Decl. ¶¶ 10, 20-25.  The City also insisted that the escorts oversee the repackaging of the paintings once they were finished being displayed in the American Museums.  *Id.* ¶ 21.  At the hearing on the City's renewed motion, counsel stated that the City did not insist that the escorts be employees of the Stedelijk, but the American Museums nonetheless chose to have Stedelijk employees — including Mr. Imanse — act as the escorts for the paintings.  Feb. 16, 2007 Tr. at 5:24 - 9:6.  Thus, Mr. Imanse and other curators from the Stedelijk  accompanied the paintings from the Netherlands to Berlin, and later from Berlin to New York, then to Houston, and ultimately back to the Netherlands.  Imanse Decl. ¶ 10.  In total, five Stedelijk escorts were in the United States for 34 days in connection with the loan.  *Id.* ¶ 25.  The American Museums paid all costs (travel, accommodation, and so on) associated with the Stedelijk couriers who accompanied the art and oversaw its handling.  *Id.* ¶ 22.

The City downplays the role played by the Stedelijk's escorts and seeks to characterize their presence in the United States as "isolated and transitory."  City's Mem. at 14. Plaintiffs, on the other hand, place load-bearing importance on the presence of these escorts in the United States.  Mem. of P. & A. In Opp' n to City's Renewed Mot. to Dismiss the Amend. Compl. in its Entirety ("Pls.' Mem.") at 8-10.  Plaintiffs emphasize that it was the Stedelijk that insisted upon

the escorts' presence in the United States and that the escorts maintained a degree of control over the paintings while they were in the United States.  *Id.*

c.    What consideration did the American Museums offer for the loan?

The Stedelijk demanded an administrative fee of $300 per painting from each museum in consideration for lending the art.  2nd Suppl. Imanse Decl. ¶ 9.   The Stedelijk also charged the Menil €1,750 for 19 color transparencies of the Malewicz paintings.  *Id.* Ex. L.  Thus, both American Museums paid administrative fees of €10,662 for 36 paintings, and the Menil paid an additional €1,750 for the transparencies.  *Id.* ¶ 28.   In addition, the Stedelijk required the American Museums to pay the cost of transporting the paintings from the Stedelijk to their various destinations.  *Id.* ¶ 11.  This included €21,324 in "crating" costs — *i.e.*, the costs of packaging the paintings for shipment from the Stedelijk to the American Museums.  Pls.' Mem. Ex. K.  The Stedelijk received the funds from the American Museums by wire transfer; it did not receive the funds through an American bank.  2nd Suppl. Imanse Decl. ¶ 29.

The City contends that the "nominal" fee of $300 per painting was merely to offset a fraction of the administrative costs that the Stedelijk incurred in loaning the artworks.  *Id.* ¶ 26.  The actual costs incurred by the Stedelijk were much greater than the amount it received from the American Museums.  *Id.* ¶ 27.  Thus, the loan was not a profit-making venture for the Stedelijk nor was it a *quid pro quo* for future loans of American art; it was an effort to make an "international cultural exchange."  *Id.* ¶¶ 31-32.

Plaintiffs take a much different view of the consideration paid as part of the loan agreement.  Plaintiffs describe the $300 per painting fee as "exorbitant" and stress the American Museums' efforts to dissuade the Stedelijk from charging any fee.  Pls.' Mem. at 10-11.  Plaintiffs

also emphasize the other costs incurred by the American Museums, such as shipping costs and the charges for the transparencies paid by the Menil. *Id.* In addition, Plaintiffs offer a letter written by the Stedelijk's Director, Rudi Fuchs, in which he stated that the Stedelijk "need[s] the money" in connection with an exhibition of Malewicz's paintings in Paris which, Plaintiffs argue, shows that the City's motive was to make a profit, not to make a "cultural exchange." *Id.* at 12 and Ex. N.

The City offers persuasive arguments as to each separate element of the transaction: the American Museums solicited the loan, and the City negotiated and executed the loan documents in the Netherlands; the American Museums were responsible for obtaining insurance and indemnity; the American Museums took possession of the paintings in the Netherlands and returned possession to the City in the Netherlands; the Stedelijk escorts were only in the United States for a total of 34 days, and their expenses were paid by the American Museums; and the City charged only a nominal fee for loaning the artwork. The problem with the City's position, however, is that it treats each of these facts in isolation rather than collectively. When the facts are taken together, the City's contact with the United States in connection with this transaction is more significant than it contends.

The Court finds guidance in two cases from the D.C. Circuit involving substantial contacts analysis under the FSIA. *See MINE*, 693 F.2d at 1105-1109; *Zedan*, 849 F.2d 1513-14. In *MINE*, the plaintiff, a Liechtenstein corporation, entered into a contract with the government of Guinea to create a company called SOTRAMAR that would provide shipping services to transport Guinean bauxite to foreign markets. 693 F.2d at 1095. In connection with the contract, the plaintiff hired an American company to perform feasibility studies regarding the SOTRAMAR venture. *Id.* at 1106. In addition, representatives of the plaintiff met with the Guinean ambassador in Washington, D.C., on one occasion to discuss the contract. *Id.* at 1108. The D.C. Circuit held that

12

these facts were insufficient to show "substantial contact" between Guinea and the United States to support jurisdiction under the FSIA. *Id.* at 1109.

In *Zedan*, the plaintiff, an American citizen, was contacted at his home in California by a Saudi company that asked him to work on a construction project in Saudi Arabia. 849 F.2d at 1512. The plaintiff accepted the offer and moved to Saudi Arabia. *Id.* The Saudi government eventually took control of the project and entered into a contract with the plaintiff under which he would be paid a salary and some portion of the profits from the project. *Id.* When the Saudi government failed to pay the plaintiff upon his return to the United States, he sued Saudi Arabia in the United States under the FSIA. *Id.* The D.C. Circuit held that the contract between the plaintiff and Saudi Arabia did not satisfy the substantial contact standard. *Id.* at 1513-15.

The contacts here are more extensive than in either *MINE* or *Zedan*. The City contracted with the American Museums knowing that the paintings would be displayed in the United States — and knowing of the heirs' claim that the City had unlawfully taken the paintings without just compensation. The City received nearly €25,000 as consideration for the contract with the American Museums, a substantial sum. More critically, it agreed to send several employees, including its Chief Curator for Paintings and Sculptures, to the United States to oversee the safety of the paintings while they were on loan. And while the contract did not require that the overseers be Stedelijk employees, it was the Stedelijk that insisted that the contract include the requirement that expert couriers accompany the artwork, and the Stedelijk knowingly agreed to send its employees pursuant to that provision of the contract. These Stedelijk employees spent, collectively, 34 days in the United States — hardly insubstantial. In short, the City contracted with the American Museums to send its Malewicz artworks to the United States, and a major portion of that contract

was performed in the United States with the ready assistance of Stedelijk employees to help ensure

its success. Thus, while the City may have technically performed its obligations in the Netherlands,

the American Museums performed a significant part of the contract in the United States with the help

and participation of Stedelijk employees, which strongly militates in favor of finding substantial

contact. *See Zedan*, 849 F.2d at 1513 ("[A] contractual arrangement, one part of which is to be

performed in the United States, constitutes a substantial contact with the United States."); *Tonoga,*

*LTD. v. Ministry of Pub. Works & Hous. of Kingdom of Saudi Arabia*, 135 F. Supp. 2d 350, 357

(N.D.N.Y. 2001) ("[T]he United States will be found to have had a substantial contact with [a

commercial] activity if substantial aspects of the contract were to be performed here.") (internal

quotation marks and modifications omitted). The Court therefore finds that the City's contact with

the United States in connection with the loan of the Malewicz artwork was substantial.[1]

> 2.      *Violation of International Law — Exhaustion of State Remedies.*

In its March 2005 decision, the Court held that in order to establish the second prong

of the FSIA's expropriation exception — that the property was taken "in violation of international

law" — a plaintiff must have pursued and exhausted his "'domestic remedies in the foreign state that

is alleged to have caused the injury'" before suing the foreign state in the United States. *Malewicz*,

362 F. Supp. 2d at 307 (quoting *Millicom Int'l Cellular v. Republic of Costa Rica*, 995 F. Supp. 14,

---

[1]    The City also argues that the loan agreement fails even to satisfy the constitutional "minimum contacts" analysis for determining personal jurisdiction. City's Mem. at 16-21. The City is correct that courts have used minimum contacts as a paradigm to help frame the "substantial contacts" analysis under the FSIA. *See Zedan*, 849 F.2d at 1511. But given that the Stedelijk knew of the heirs' adverse claims and insisted that the American Museums procure a promise of immunity from the U.S. State Department, the City cannot legitimately argue that it could not "reasonably anticipate being haled into court" in the United States, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985), or that it did not "purposefully avail itself of the privilege of conducting activities within" the United States, *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 109 (1987).

23 (D.D.C. 1998)). The Court also held that a plaintiff need not exhaust domestic remedies if the remedies available in the foreign sovereign's courts are "inadequate." *Malewicz*, 362 F. Supp. 2d at 307 (citing *Millicom*, 995 F. Supp. at 23)). Relying on cases discussing *forum non conveniens*, the Court reasoned that "an alternative forum in which the plaintiff can recover nothing for a valid claim is not adequate. This is certainly the case when the statute of limitations in the alternative forum would bar a plaintiff's claims." *Malewicz*, 362 F. Supp. 2d at 307–08 (internal quotation marks and citation omitted). Because it was not clear on the facts in the record whether the Dutch statute of limitations had run on Plaintiffs' claims, the Court could not decide whether Plaintiffs must comply with the exhaustion requirement. *Id.* at 308.

      The City now asks the Court to reconsider its holding that the exhaustion requirement does not apply if a plaintiff's remedies in the foreign courts would be inadequate. According to the City, the Court erred when it relied on principles developed in the area of *forum non conveniens* because *forum non conveniens* involves a discretionary transfer of a case over which the court clearly has jurisdiction, whereas the exhaustion of remedies requirement under the FSIA's expropriation exception is a prerequisite to jurisdiction in the first instance. City's Mem. at 4-5. In other words, the rationales behind the two doctrines are different and, therefore, the concept of "inadequacy" in the exhaustion of domestic remedies doctrine is not coextensive with the concept of "inadequacy" in the *forum non conveniens* doctrine. Plaintiffs respond that there is no basis to reconsider but, if the Court does decide to reconsider, it should decide that there is no exhaustion of remedies requirement at all. Pls.' Mem. at 20-21.

      There is some facial appeal to the City's point that the exhaustion requirement in *forum non conveniens* cases is not analogous to the exhaustion requirement under the FSIA's

expropriation exception, although it cites no authority to support that conclusion.  Whatever the merits of its suggestion, it is not persuasive here, especially given the absence of any supporting authority.  The City provides no basis for the Court to reconsider its prior decision.  *See* Fed. R. Civ. P. 54(b); *Childers*, 197 F.R.D. at 190.

Nonetheless, it is an open question whether, in the instant case, Plaintiffs were required to exhaust their remedies in the Netherlands or whether they were excused from that requirement because their claims would be barred in the Dutch courts by the statute of limitations. The parties have submitted supplemental briefing and declarations from Dutch lawyers explaining the applicable Dutch civil law doctrines of liberative and aquisitive prescription.  In a somewhat ironic twist, the City argues that the applicability of liberative or aquisitive prescription to Plaintiffs' claims is "open and debatable" in the Dutch courts, City's Suppl. Submission at 2, while Plaintiffs argue that it is "firmly established" that "a Dutch court would [hold] that [Plaintiffs'] action was time-barred," Pls.' Resp. to Suppl. Submission at 2.

Having reviewed the expert declarations submitted by the parties, the Court is inclined to agree with Plaintiffs that any claim they may have had against the City based on the wrongful acquisition or possession of the Malewicz paintings would be barred by operation of law. In this case, Plaintiffs seek damages and injunctive relief — they ask for monetary compensation for the City's wrongful acquisition and possession of the paintings without just compensation, and they ask for an order instructing the City to return possession of the paintings to Plaintiffs.  *See* Am. Compl., Prayer for Relief ¶¶ 1-5.  Given these demands, the Dutch legal doctrines of liberative prescription and aquisitive prescription would apply.  *See* Salomons Decl. ¶¶ 6, 18.  Under the former doctrine of Dutch law, any claim for damages based on a debt expires no later than 30 years

after the debt accrues.  *Id.* ¶ 8.  Under the latter doctrine, any claim to regain possession of property expires no later than 30 years after the possessor first acquired possession.  *Id.* ¶¶ 21-23.

Here, the City first acquired possession of the paintings by admitted loan in 1956, and it exercised an alleged option to purchase the paintings outright in 1958.  Thus, any claim seeking damages based on the unlawful acquisition or possession of the paintings would have expired no later than 1988.  *See id.* at ¶¶ 8-10.  The City's good faith, continuous possession, or knowledge of the heirs' adverse claims are irrelevant under Dutch law; it is the passage of time that matters.  *See id.* ¶ 11.  Although certain events may interrupt the prescription period, such as the filing of a lawsuit or a written demand from the creditor, *id.* ¶¶ 13-15, there is no indication that any of these events took place here before 1988.  Similarly, any Dutch civil-law claim seeking the paintings' return (*i.e.*, a common-law claim for replevin) expired, at the latest, in 1988.  The acquisitive prescription doctrine does not include an equivalent to the American concept of equitable tolling: once the 30-year period expired, the City was absolved of any legal duty to relinquish possession of the paintings, regardless of whether the City acted in bad faith.  *Id.* ¶ 21; Polak Decl. ¶ 5.  Moreover, acquisitive prescription occurs by operation of law on the date the 30-year period expires; it cannot be waived or delayed even if the possessor consents.  Salomons Decl. ¶ 29.  Thus, under Dutch law, the City acquired valid legal ownership of the paintings by acquisitive prescription no later than 1988.

The City argues that the preclusive effect of liberative prescription can be abated if a court finds that invoking the doctrine would be "unacceptable according to criteria of reasonableness and equity."  City's Suppl. Submission at 2; Salomons Decl. ¶ 16.  Plaintiffs respond that this aspect of the liberative prescription doctrine is confined to personal injury cases (such as asbestos cases) and has never been applied to cases involving property rights.  Pls.' Resp. to Suppl.

Submission at 3; Polak Decl. ¶¶ 7-9.  The Court need not wade into this dispute over Dutch substantive law because, even assuming that the City is correct, the concept of reasonableness and fairness is too thin a reed to support the City's position that the applicability of the prescription doctrines to Plaintiffs' claims is "open and debatable."  The Court is persuaded by the parties' supplemental submissions, and it finds that Plaintiffs' claims would be barred in the Dutch courts under the civil law doctrines of liberative and acquisitive prescription.  As a result, any remedy in the Netherlands would be non-existent and inadequate.  Plaintiffs were not required to exhaust their domestic remedies in order for this Court to have jurisdiction under the FSIA.

> **B.     Statute of Limitations**.

> The City has also moved to dismiss based on the statute of limitations.  Motions to dismiss based on a limitations defense are disfavored because resolution generally requires the development of a record and the adjudication of factual issues.  *See Richards v. Mileski*, 662 F.2d 65, 73 n.13 (D.C. Cir. 1981).  Dismissal on statute of limitations grounds is only appropriate when the complaint establishes the defense on its face.  *See id.*

> The statute of limitations at issue here is the District of Columbia's three-year statute for claims relating to "the recovery of personal property or damages for its unlawful detention." D.C. Code § 12-301(2); *Gilson v. Republic of Ireland*, 682 F.2d 1022, 1025 n.7 (D.C. Cir. 1982) ("The applicable statute of limitation [in a FSIA case] is determined by the local law of the forum."). If a defendant lawfully acquires the property in the first instance (*e.g.*, through a bailment), a claim for conversion accrues when the plaintiff demands the return of the property and the defendant refuses, or when the defendant takes some action that a reasonable person would understand to be either an act of conversion or inconsistent with a bailment.  *In re McCagg*, 450 A.2d 414, 416 (D.C.

1982).  "Where a demand and refusal are relied on to show a conversion, the refusal must be absolute

and unconditional . . . .  A refusal which is not absolute, but is qualified by certain conditions which

are reasonable and justifiable . . . is not a sufficient basis for a conversion action."  90 C.J.S *Trover*

*& Conversion* § 45 (2006).  But when the defendant did not acquire the property lawfully in the first

instance, the claim accrues immediately and there is no need for a demand and refusal to trigger the

statute of limitations.  *See Shea v. Fridley*, 123 A.2d 358, 361 (D.C. 1956).

   The City argues that the heirs' claims accrued in 1958 when the City exercised its

option in the loan agreement and purchased the Malewicz collection for DM120,000.  City's Mem.

at 22-23.  The City contends that there was no need for the heirs to demand that the paintings be

returned because Plaintiffs allege that the City's initial acquisition of the paintings was unlawful.

*See* Am. Compl. ¶¶ 35, 41.  But the Amended Complaint also alleges that the paintings were merely

loaned to the City in 1958 and that their acquisition was hidden and not publicized.  *Id.* ¶ 21.  Thus,

Plaintiffs argue that the claim did not accrue at that time.  *See* Pls.' Mem. at 24-25.  Acknowledging

this allegation, the City argues that it took acts that were clearly inconsistent with any type of lease

interest in the paintings as early as 1960.  City's Mem. at 24-25.  Specifically, the City cites

catalogues published by the Stedelijk which described its "acquisition" and "purchase" of the

Malewicz paintings.  *Id.*; 2nd Suppl. Imanse Decl. Ex. D.  Plaintiffs respond that either the

statements in the catalogues were not sufficiently clear to put them on notice that the City was

claiming ownership or, in the alternative, that the statute of limitations should be equitably tolled

because many of the heirs were living "behind the Iron Curtain" and therefore could not discover all

the facts relevant to their claims.  Pls.' Mem. at 25, 30-32.

The City further argues that even assuming that the statute of limitations were equitably tolled, the tolling period could under no circumstance extend beyond 1996, when an attorney representing the heirs formally demanded that the City return the paintings. *See* City's Reply Mem. at 20.  Because the City rejected the heirs' demand in November 1996, the City argues that the statute of limitations expired no later than November 1999. *Id.*  Plaintiffs respond that the City's November 1996 response to their demand was equivocal and therefore insufficient to put them on notice that the City was claiming ownership of the paintings.  According to Plaintiffs, the City's final refusal did not come until September 2001, which means that their claims were still timely when they filed this lawsuit in January 2004.  Pls.' Mem. at 26-30.

As the foregoing discussion of the parties' arguments demonstrates, the statute of limitations question requires the Court to consider a large amount of evidence outside the pleadings. Not only would the Court have to decide between competing interpretations of the documents in question, it would have to decide whether the statute of limitations should be equitably tolled, which also involves the consideration of facts.  *See Chung v. U.S. Dep't of Justice*, 333 F.3d 273, 278-79 (D.C. Cir. 2003) (the statute of limitations may be equitably tolled "when the plaintiff despite all due diligence . . . is unable to obtain vital information bearing on the existence of his claim.") (internal quotation marks omitted).  The Court thus concludes that the City's statute of limitations defense is not appropriate for resolution in a motion to dismiss.  The City may have a complete defense based on the statute of limitations.  But because the defense does not appear on the face of the Amended Complaint, the Court must avoid resolving the matter until the record is more complete.

C.      **The Act of State Doctrine**.

"The act of state doctrine 'precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory.'" *World Wide Minerals v. Republic of Kazakhstan*, 296 F.3d 1154, 1164 (D.C. Cir. 2002) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964)). "Under that doctrine, the courts of one state will not question the validity of public acts (acts *jure imperii*) performed by other sovereigns within their own borders, even when such courts have jurisdiction over a controversy in which one of the litigants has standing to challenge those acts." *Altmann*, 541 U.S. at 700. Thus, the doctrine applies whenever "the relief sought or the defense interposed would [require] a court in the United States to declare invalid the official act of a foreign sovereign." *Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp.*, 493 U.S. 400, 405 (1990). It prevents a U.S. court "from deciding a case when the outcome turns upon the legality or illegality (whether as a matter of United States, foreign, or international law) of official action by a foreign sovereign performed within its own territory." *Riggs Nat'l Corp. & Subsidiaries v. Comm'r of IRS*, 163 F.3d 1363, 1367 (D.C. Cir. 1999). "Essentially, if a state is acting in the public interest then it is asserting its sovereignty and the act of state doctrine may apply." *Virtual Def. & Dev. Int'l v. Republic of Moldova*, 133 F. Supp. 2d 1, 7 (D.D.C. 1999).

"The Supreme Court has suggested a 'balancing approach' when deciding if the act of state doctrine applies. It is necessary to balance the judiciary's interest in hearing a case involving a commercial activity with the desire to avoid matters of foreign affairs controlled by the executive or legislative branches. In balancing these interests, a court should be mindful that the decision to deny judicial relief to a party should not be made lightly." *Id.* at 7-8 (citing *Sabbatino*, 376 U.S. at

428) (internal citation omitted).   It is important to note that the act of state doctrine "is not a jurisdictional limit on the courts." *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 707 (9th Cir. 1992) (internal quotation marks omitted).   Thus, a motion to dismiss based on the act of state doctrine is properly considered under Rule 12(b)(6), not Rule 12(b)(1).   In order to dismiss a complaint under Rule 12(b)(6) based on the act of state doctrine, a district court "must be satisfied that there is no set of facts favorable to the plaintiffs and suggested by the complaint which could fail to establish the occurrence of an act of state." *Temistocles Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1534 (D.C. Cir. 1984), *rev'd on other grounds*, 471 U.S. 113 (1985).

The City argues that this case falls within the act of state doctrine because its acquisition of the Malewicz paintings was an "official act of the City."   City's Mem. at 30.   It further argues that the policies underlying the doctrine — that courts should not interfere with matters that could complicate foreign relations and should defer to the executive branch in the area of foreign policy — are implicated here because a decision against the City would chill future cultural exchanges such as the one at issue in this case.   *Id.* at 31-32.   Plaintiffs argue that the doctrine is inapplicable because it applies only to acts by a sovereign nation, not to acts by political subdivisions of a foreign government such as the City of Amsterdam.   Pls.' Mem. at 33-34.   Plaintiffs further argue that the Second Hickenlooper Amendment, 22 U.S.C. § 2370(e)(2), precludes the City's assertion of the act of state doctrine because it prohibits a foreign sovereign from asserting that defense in a case that is based on an alleged taking in violation of international law.   *Id.* at 35-36.[2]

---

[2] In support of their first argument, Plaintiffs cite no federal case law, and the Court is aware of none, that supports the argument that a political subdivision of a sovereign nation is incapable of performing an "act of state."   Because the Court concludes that the City's acquisition of the Malewicz artwork is not the type of sovereign act that is subject to the act of state doctrine, it need not address this question.   As to Plaintiffs' second argument, the Hickenlooper Amendment by its

A review of the cases reveals that the City's attempt to cast its acquisition of the Malewicz artwork as an "official act" stretches the meaning of that phrase — and hence the act of state doctrine — too far.  The cases reveal that the key question is whether the act in question is truly a *sovereign* act — that is, an act "*jure imperii*," an act that is taken "by right of sovereignty." *Black's Law Dictionary* 854 (7th ed. 1999).  The D.C. Circuit recently decided a case that aptly illustrates this point.  *See Soc'y of Lloyd's v. Siemon-Netto*, 457 F.3d 94 (D.C. Cir. 2006).  *Lloyd's* originated with a dispute in the British insurance industry, which is regulated by the Society of Lloyd's pursuant to a series of Parliamentary Acts, known as the "Lloyd's Acts," giving Lloyd's authority to oversee individual and corporate underwriters, which are known as "Names." *Id.* at 96.  Before becoming authorized underwriters, the Names enter into a standardized contract with Lloyd's in which they agree to follow all present and future laws and regulations governing Lloyd's control over the insurance markets.  *Id.* at 96-97.  In response to crushing losses to Lloyd's underwriters occasioned by toxic tort litigation in the 1980s and 1990s, Lloyd's devised a plan under which all the Names were required to purchase reinsurance for their pre-1993 liabilities.  *Id.* at 97.  Most of the Names agreed and paid the reinsurance premiums that Lloyd's required; others, however, refused to accept the reinsurance program and Lloyd's — acting pursuant to its authority under the Lloyd's Acts — appointed a substitute agent who accepted the reinsurance plan on behalf of the objecting  Names.  *Id.* at 97-98.  Lloyd's then brought lawsuits against the recalcitrant Names to collect the reinsurance premiums and eventually obtained money judgments against them.  *Id.*

---

terms applies only to takings "after January 1, 1959."  22 U.S.C. § 2370(e)(2).  Because the City acquired the Malewicz paintings by loan in 1956, and then exercised an alleged option to purchase them in 1958, *see* Suppl. Imanse Decl. ¶ 2 and Exs. A & B, the Hickenlooper Amendment does not apply.

Gillian and Uwe Simeon-Netto were Names who refused to participate in the reinsurance plan and against whom Lloyd's obtained a judgment in the British courts. *Id.* at 98. Lloyd's sought to enforce that judgment in this Court under the District of Columbia's Recognition Act, D.C. Code § 15-382. *Id.* at 98-99. The Simeon-Nettos raised an affirmative defense that the Lloyd's Act giving Lloyd's authority to appoint a substitute agent that could bind the Names to the reinsurance plan was an unlawful delegation of legislative power to Lloyd's, a private business entity. *Id.* at 99. The D.C. Circuit held that this affirmative defense was precluded by the act of state doctrine because a law passed by the British legislature was an official sovereign act that only the British courts could review. *See id.* at 102-03. A comparison of other cases discussing the act of state doctrine reveals that it is sovereign acts such as this that are immune from scrutiny under the act of state doctrine. *Compare Sabbatino*, 376 U.S. at 423 (order issued by Cuban president to seize sugar shipment was an act of state); *World Wide Minerals*, 296 F.3d at 1164 (government's issuance of an export license was an act of state); *Riggs*, 163 F.3d at 1367 (Brazilian Minister of Finance's order to Brazilian bank to pay income tax was an act of state); *Doe v. State of Israel*, 400 F. Supp. 2d 86, 113-14 (D.D.C. 2005) (Israeli government's settlement policies and tactics in the West Bank were acts of state); *with Virtual Defense*, 133 F. Supp. 2d at 8 (government's sale of MiG fighter jets was not an act of state); *Owens v. Republic of Sudan*, 374 F. Supp. 2d 1, 26-27 (D.D.C. 2005) (government agency's material support to foreign terrorist organization was not an act of state).

These authorities demonstrate that the City's acquisition of the Malewicz paintings from Hugo Haring in 1956 was not the type of sovereign act that receives protection under the act of state doctrine. The acquisition may have been an "official" act in the sense that it was done by an employee of the City of Amsterdam — the director of the Stedelijk — acting in his capacity as

such.  But it was not an "official action by a foreign sovereign" as that phrase has been used in the relevant case law because it was not an action taken "by right of sovereignty"; any private person or entity could have purchased the paintings for display in a public or private museum.  *Cf. Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 697-98 (1976) (opinion of White, J.) ("[Courts] are in no sense compelled to recognize as an act of state the purely commercial conduct of foreign governments . . . .").  In other words, there was nothing *sovereign* about the City's acquisition of the Malewicz paintings, other than that it was performed by a sovereign entity.  Moreover, the fact that the initial acquisition of the Malewicz paintings took place in Germany, not in the Netherlands, further illustrates that it was not an "official action" within the scope of the City's sovereign authority.  *See World Wide Minerals*, 296 F.3d at 1164 ("The act of state doctrine precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power *committed within its own territory*.") (emphasis added) (internal quotation marks omitted).

Further, this Court's application of international law to the City's acquisition of the Malewicz paintings would do nothing to "frustrate the conduct of foreign relations by the political branches of the government."  *First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 767-68 (1972).  The City's argument that this lawsuit could chill further cultural exchanges again overreads the case law.  The loan of the artwork from the City to the American Museums was not a matter touching upon "foreign relations," as that phrase is used by the relevant authorities.  *See id.* It was a private transaction, admittedly with an altruistic public purpose, that had no far-reaching national or international implications.  Essentially, the City has done nothing more than show that paintings were acquired by an employee of the Stedelijk under the authority of the City, which is

itself a political subdivision of the Netherlands.  That alone is insufficient to make the acquisition

an "act of state."  The Court must therefore reject the City's argument that the act of state doctrine

applies in this case.

> **D.      *Forum Non Conveniens*.**

The *forum non conveniens* doctrine allows a court to dismiss an action over which

it has jurisdiction when there is an adequate alternative forum in which the case can be more

conveniently heard.  *See BPA Int'l v. Kingdom of Sweden*, 281 F. Supp. 2d 73, 85-86 (D.D.C. 2003).

*Forum non conveniens* presupposes that there are at least two jurisdictions where the defendant may

be sued; thus, the threshold inquiry is whether there is an adequate alternative forum where the

plaintiff may bring his claims.  *Id.*  If there is an alternative forum that has jurisdiction over the

defendant, a court should balance the private interests of the litigants against the public interest to

determine whether a motion to dismiss should be granted.  *Id.*  The weight of either the private

interest factors or the public interest factors alone may be cause for dismissal.  *Id.*  While courts

usually give a plaintiff's choice of forum substantial deference, this factor carries much less weight

when the plaintiff is a stranger to the forum.  *Id.*  The *forum non conveniens* determination is

committed to the sound discretion of the trial court.  *Id.*

The Court's prior ruling is clearly correct that, if Plaintiffs' claims would be time

barred in the Netherlands, it should not dismiss based on *forum non conveniens*.  *Malewicz*, 362 F.

Supp. 2d 307-08.  And, as discussed above, the Court believes that Plaintiffs' claims would be barred

in the Dutch courts based on liberative and acquisitive prescription.  Accordingly, the City's *forum*

*non conveniens* argument must fail.

## IV.  CONCLUSION

Whether the City's contact with the United States in connection with the loan of the Malewicz paintings was "substantial" is a close question, but the record contains sufficient contacts to establish jurisdiction under the FSIA's expropriation exception.  The City's other arguments fall short.  The statute of limitations defense may have merit, but it involves too many factual issues to be resolved in a Rule 12 motion.  The act of state doctrine is not geared toward the type of act at issue here — *i.e.*, the acquisition of artworks for display in an art museum.  And the *forum non conveniens* argument fails because Plaintiffs would be precluded from bringing claims in the Netherlands due to the Dutch doctrines of liberative and acquisitive prescription.  Accordingly, the City's Renewed Motion to Dismiss will be denied.  A memorializing order accompanies this Memorandum Opinion.

Dated:  June 27, 2007

                                        /s/
                              ROSEMARY M. COLLYER
                              United States District Judge